**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **JIM STANLEY INDIVIDUALLY** | § | |
| **AND DENISE STANLEY,** | § | |
| **INDIVIDUALLY AND** | § | |
| **AND AS NATURAL TUTRIX OF HER** | § | |
| **DAUGHTER AMANDA LAND,** | § | |
| **A MINOR** | § | |
| | § | |
| **Plaintiffs,** | § | **Civil Action No. 1:10-cv-01719** |
| | § | **(ECF)** |
| **v.** | § | |
| | § | |
| **REMINGTON ARMS COMPANY,** | § | |
| **INC.,** | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

COMES NOW, Plaintiffs Jim Stanley individually and Denise Stanley, individually and As Natural Tutrix of her daughter, Amanda Land, a minor ("Plaintiff"), complaining of Defendant Remington Arms Company, Inc. ("Remington"), and files this Original Complaint, and for their cause of action would show the Court and the jury the following:

### JURISDICTION AND VENUE

1.     The jurisdiction of this Court attaches under the provisions of 28 U.S.C. §1332, in that the amount in controversy exceeds, exclusive of interest and costs, the sum of $75,000, and the parties are citizens of different states.

2.     Federal court jurisdiction is based on diversity of citizenship, and venue is proper according to 28 U.S.C. §1391 (a) and (c) in a federal forum located in an area where a defendant is deemed to reside and subject to personal jurisdiction based on Defendant's contacts with the

forum.   Defendant has continuous and systematic contacts within the Western District of Louisiana and throughout the United States.

3.      The Western District of Louisiana, Alexandria Division, has jurisdiction in this case on grounds of diversity of citizenship, and the Western District of Louisiana is also a proper venue under 28 U.S.C. §1391(a) and (c).  For purposes of the federal venue statute, Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced.  28 U.S.C. §1391(c).  Defendant currently sells their firearms products throughout the Western District of Louisiana, Alexandria Division.  Thus, Defendant's contacts with the Western District of Louisiana are continuous and systematic.  Venue is proper in the Western District of Louisiana, Alexandria.

4.      For the convenience of the parties and witnesses, who may all be found in Rapides Parish, plaintiffs request that this Complaint be allocated to the Alexandria Division.

## PARTIES

5.      Plaintiff Jim Stanley is a citizen of the State of Louisiana and resides in Boyce, Louisiana, within the Parish of Rapides.

6.      Plaintiff Denise Stanley is a citizen of the State of Louisiana and resides in Boyce, Louisiana, within the Parish of Rapides.

7.      Plaintiff Amanda Land, a minor, is a citizen of the State of Louisiana and resides in Boyce, Louisiana, and is the natural daughter of Denise Stanley.

8.      Defendant Remington Arms Company, Inc. is a corporation foreign to the State of Louisiana being organized and incorporated under the laws of the State of Delaware and having its principal place of business in North Carolina.  At all times relevant to this action, Remington was doing business in the State of Louisiana by selling, manufacturing and distributing rifles

through its distributors and sales force.  Remington will be asked to waive service under Federal Rule of Civil Procedure 4.

## FACTUAL BACKGROUND

9.     On November 15, 2009, Plaintiffs were hunting on a deer lease camp not far from Leesville, Louisiana in Vernon Parish.  As plaintiff Jim Stanley drove a four wheeler into deer camp with Amanda Land, a minor, riding as a passenger, Richard Lee Durison was in the process of stowing his Remington Model 700 bolt action rifle into a rifle case.  As Mr. Durison was doing so, the Remington Model 700 fired absent a trigger pull.  Plaintiffs Jim Stanley and Amanda Land, a minor, were hit by shrapnel from the gun shot.  Plaintiff Denise Stanley was just a few feet away from the four wheeler at the time the rifle fired and injured her daughter and husband which she witnessed contemporaneously as the incident occurred.

10.    Remington has been engaged in the business of designing, manufacturing, assembling, distributing and selling firearms for well over a century and in this regard did design, manufacture, distribute, sell, and place into the stream of commerce the Remington Model 700 bolt action rifle including the action, fire control system, and safety (hereinafter "rifle"), knowing and expecting that the rifle would be used by consumers and around members of the general public.

11.    The Remington Model 700 bolt action rifle contains a dangerously defective "Walker" fire control system that may (and often does) fire without a trigger pull upon the rifle experiencing a vibration which can and does occur as a result of different normal conditions in which a sporting rifle is intended to be used, including but not limited to, release of the safety, movement of the bolt, or when otherwise jarred or bumped.

12.    Remington continues to utilize the "Walker" fire control design and manufactures,

distributes and sells its product lines, including the Remington Model 700 bolt-action rifle. Remington designed a new trigger mechanism known as the X-Mark Pro that is safe (and that represents a safer alternative design). Remington began installing the X-Mark Pro design in almost all of its bolt-action rifles beginning on or about the time period 2007 and 2008.

13.    Defendant's actions, when viewed objectively from the standpoint of the actor at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Defendant's consumers and the general public, including Plaintiffs.   Defendant had (and has) actual, subjective awareness of the risk of serious and significant injury or death to others as a result of its decision to continue to utilize the Walker fire control mechanism for the Model 700 rifle.   Defendant nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others by utilizing a known defective component in the rifles sold, millions of which remain in the hands of an unsuspecting public.   Defendant's actions clearly reflect willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care that raises a presumption of conscious indifference to consequences.   Exemplary damages should be assessed against Remington to punish and penalize the Defendant, and to deter it and others from disregarding the rights, safety and welfare of the general public.

14.    Despite a defect that Remington has known of for sixty years and subsequently over the decades in at least the form of  over 4,000 documented complaints of unintended discharge from the American hunting community, many jury verdicts finding that the design is defective (including at least 2 findings of gross negligence), and more than $20 million in settlements paid to injured consumers since 1993—millions of unsuspecting users hunt today among and around their friends and families with a rifle that will fire absent a trigger pull.

15.    Remington put its profits over the safety of hunters and their families and friends. It

finally began to use its safer alternative design, the X-Mark Pro trigger mechanism, on or around 2007 or 2008. However, Remington continues to refuse to own up to its responsibility to warn the public and recall the millions of rifles it sold while knowing the trigger mechanism was faulty and defective. This "profits over people" or "profits over safety" mentality is exactly the conduct that exemplary damages are designed to prevent.

16.     Over 100 injured individuals have sued or made claims against Remington over the same defective design, and several juries, including at least two federal court juries, have found Remington's fire control to be defective.

17.      In January 25, 1990, an internal Remington memo revealed:  "The number of Model 700 rifles being returned to the factory because of alleged accidental firing malfunctions is constantly increasing.  170 were returned to Product Service for examination in 1989 with various accidental firing complaints.  To date this year, 29 have been returned."  Ignoring thousands of customer complaints of Remington rifles that contained the Walker fire control, Remington refuses to recall its rifles or warn its customers.

18.     Remington's defective trigger mechanism uses an internal component called a "connector"—a design component not used by any other rifle manufacturer.  The connector floats on top of the trigger body inside of the gun, but is not physically bound to the trigger in any way other than spring tension.  The connector cannot be seen or controlled by the gun handler.  When the trigger is pulled, the connector is pushed forward by the trigger, allowing the sear to fall and the rifle to fire.

19.     The proper position of the connector under the sear requires an overlap—or "engagement"—of only approximately 25/1000ths of an inch (half the width of a dime or eight human hairs).  But because the connector is not bound to the trigger, during the recoil action

after each firing of the rifle, the connector separates from the trigger body several times and creates a gap between the two parts.  This separation is recorded in Remington's own high-speed video footage of the fire control during discharge.  Any dirt, debris or manufacturing scrap can then become lodged in the space created between the connector and the trigger, preventing the connector from returning to its original position.

20.    Remington's own experts have admitted the existence of this dangerous condition:

Q.    From a performance standpoint, the trigger connector, by the time the Model 710 was introduced, did nothing to truly enhance performance.

A.    I think that's true.

Q.    Are there any circumstances, in your judgment or experience, depending upon, you know, again, what other factors may be at play, where the trigger connector does increase the risks or the safety concerns with use of the Walker fire-control system?

A.    It theoretically adds one more point at which you could put in debris and prevent the connector from returning underneath the sear, and that is between the trigger and the connector.

Q.    Let me see if I understand what you just said. On a theoretical level, the trigger connector does present a moving part that under certain circumstances could result in debris getting between the trigger connector and the trigger body, correct?

A.    Right.

Deposition of Remington liability expert Seth Bredbury, *Williams v. Remington*.

21.    When enough displacement occurs, the connector will no longer support the sear (either no engagement is present, or insufficient engagement is present) and the rifle will fire without the trigger being pulled.  This can occur in a variety of ways including when the safety is released, when the bolt is closed, or when the bolt is opened.  These unintended discharges occur so frequently that Remington actually created acronyms for internal use (Fire on Safe Release—"FSR"; Fire on Bolt Closure—"FBC"; Fire on Bolt Opening—"FBO"; and Jar Off—"JO").  The

various manifestations notwithstanding, all of the unintended discharges result from the same defective condition—the susceptibility of the connector to be displaced from its proper position. Even one of the designers believes housing of the fire control parts is incorrectly designed.

22.    When questioned about this susceptibility shown in Remington's own high-speed video footage, Remington engineer Michael Keeney offered the following:

> Q.    In those frames, does the connector appear to be separated from the trigger body?
>
> A.    Yes.
>
> Q.    And if debris is inside the housing, that would provide an opportunity for debris to come between the connector and the trigger body; correct?
>
> A.    That is correct.

Deposition of Remington engineer Michael Keeney, *Williams v. Remington*.

23.    Derek Watkins, another Remington engineer, explained that this defect could lead to a dangerous situation:

> Q.    If the trigger doesn't return for whatever reason to full engagement. . . , that is not safe; would you agree with me? Because the gun is now more susceptible --
>
> A.    It is more—it is more sensitive, yes; it is more sensitive.
>
> Q.    It is more sensitive to forces that would jar the rifle in such a way for that engagement, basically, for the trigger no longer to be underneath the sear and the gun to discharge?
>
> A.    Yes.

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington*.

24.    James Ronkainen, another Remington engineer, also admits that failure of the connector to properly engage leads to a dangerous condition:

> Q.    One common factor in a fire on safe-release and a theoretical firing on bolt-closure is that the connector is not in its appropriate condition — position; correct?

A.    Yes.  It is unable to support the sear.

Deposition of Remington engineer James Ronkainen, *Williams v. Remington*.

25.    This dangerous condition caused Remington to embark on redesign efforts many times in the 1980's and 1990's. The goal of these efforts was to eliminate the defect:

Q.    The goal while you were there was to — is to achieve a design that did not result in a fire on safety-release; is that correct?

A.    The design was to eliminate any type of-- any type of debris or any type of firing from that standpoint.  Fire on bolt-closure, yeah, we did-- we definitely did not want that to happen.

Deposition of former Remington engineer Derek Watkins, *Williams v. Remington*.

26.    When Remington again contemplated a recall of the Model 700 rifle (and similar firearms) in the mid-nineties, Kenneth D. Green, Manager of Technical & Consumer Services, drafted a forthright warning letter to owners of Remington rifles, which included the following language (emphasis in original):

"This safety notice is being sent to be sure you understand that if your Model 700, Model Seven or Model 40X rifle is loaded, the gun may accidentally fire when you move the safety from the "safe" position to the "fire" position, or when you close the bolt."

27.    Mr. Green sent the draft warning to Remington's Bob Lyman for approval.  Mr. Lyman did not approve the draft.  Instead, he wrote in the margin to the left of the above language, "Needs to be rewritten; too strong."  Mr. Lyman, likely speculating that the language would hurt sales or confirm Remington's knowledge of the defect, ensured that Remington's customers never received the warning.

28.    Remington's defective fire control also could have been redesigned to eliminate the harm or danger very inexpensively.  Several companies sell connector-less replacement triggers for the Model 700.  There is no valid engineering reason why the successfully utilized connector-

less designs could not have been used by Remington in its Model 700, 710 and 770.

29.     Remington has recently removed the connector for some of its Model 700 rifles with a newly designed trigger mechanism, the X-Mark Pro.  That design was completed in 2002.  Even Remington's President and CEO, Thomas L. Millner, agreed in his 2007 deposition that the X-Mark Pro is a safer design (Question:  "Did [Remington] make a safer fire control with the X-Mark Pro?"  Answer:  "Yes, I believe so.").

30.     Not only did Mr. Millner admit that the design is safer, he admits that the new design prevents the rifle from firing upon release of the safety (Question:  "And this new design precludes [fire on safety release] from occurring, true?"  Answer:  "True.").  Finally, he admits that the old design—the design placed into Mr. Bledsoe's rifle even after Remington had the new design—does not have safety features precluding fire on safety release (Question:  "And that's the fire control that does not have the safety features that preclude the fire on safe release, true?"  Answer:  "That's correct.").  But Remington still have not taken action to include the new fire control in all of its bolt action rifles or even warn the public regarding a known safety issue.  Remington still widely uses the old fire control today, knowingly subjecting users to the gravest of dangers.

31.     Jury verdicts and appellate court opinions provide a succinct account of Remington's long-standing knowledge of its defective fire control.  In *Lewy v. Remington,* the Eighth Circuit upheld a finding of punitive damages against Remington in 1985:

> We hold that there was sufficient evidence from which the jury could find that Remington knew the M700 was dangerous.  The following evidence was before the jury: complaints from customers and gunsmiths that the Model 700 would fire upon release of safety, some of these complaints dating back as far as the early 1970s (footnote text in opinion omitted); Remington's own internal documents show that complaints were received more than two years before the Lewy rifle was produced; Remington created a Product Safety Subcommittee to evaluate M700 complaints and on two occasions decided against recalling the

M700; and Remington responded to every customer complaint with a form letter that stated that they were unable to duplicate the problem, that the customer must have inadvertently pulled the trigger and that Remington could not assume liability for the discharge.

We believe that in viewing this evidence, and permissible inferences, in the light most favorable to the Lewys a jury could reasonably conclude that Remington was acting with conscious disregard for the safety of others.  Remington maintains that their actions in investigating and responding to customer complaints and in creating the Product Safety Subcommittee to study the customer complaints reflect their good faith and sincerity in dealing with the M700.  However, another permissible view to be drawn from all of this evidence may be that Remington was merely "gearing up" for a second round of litigation similar to the litigation involving the M600 which resulted in the ultimate recall of the M600.  Remington's Product Safety Subcommittee concluded that of approximately two million M700s held by the public about 20,000 of them may have a potential defect (footnote omitted).  A recall was not pursued because of the relatively small number of rifles that may have the defective condition. *See, e.g., Kehm v. Proctor & Gamble Mfg. Co.,* 724 F.2d 613, 620 (8th Cir.1983) ("[I]n determining whether a manufacturer has a duty to warn, courts inquire whether the manufacturer knew that there were even a relatively few persons who could not use its product without serious injury, and whether a proper warning would have helped prevent harm to them.").  Thus, the jury may have concluded that rather than suffer the expense of a recall, Remington would rather take their chances that the 20,000 potentially dangerous M700 rifles held by the public will not cause an accident.  Such a view, if true, would certainly establish that Remington acted with conscious disregard for the safety of others.

32.     On March 24, 1992, The United States Court of Appeals, Ninth Circuit, affirmed a jury verdict of $724,000 in a case alleging discharge on bolt closure.  *Campbell v. Remington Arms Co.*, 1992 WL 54928, *2 (C.A. 9 (Alaska) 1992) (unpublished opinion).

33.     On December 31, 1992, the Texas Supreme Court, in *Chapa v. Garcia*, 848 S.W.2d 667, 671-74 (Tex. 1992), specifically describes Remington's fire control as "defective":

Luis Chapa clearly established the relevance of and his need for the documents, by offering evidence demonstrating that the NBAR program had as its goal improvement of the defective fire control on the Model 700 and that Chapa faced a significant time gap in the record as to Remington's *knowledge* of the defect (footnote omitted).  Included in Chapa's showing was:

● a 1985 Remington memorandum describing the NBAR program as one to design a "replacement for the Model 700"

● another Remington memorandum declaring that an improved fire control be installed in the Model 700 no later than October 1982 "to put us in a more secure position with respect to product liability"

● a memorandum evidencing an increase of $130,000, in early 1981, in the research budget for development of an improved Model 700 fire control

● proof of the abrupt discontinuation of further research into the fire-control system of the Model 700 after December 1981 coincident in time with the commencement of the NBAR program

● deposition testimony that models of new, improved fire controls had been designed and assembled as part of NBAR, that prototypes had been built and tested, and that the NBAR fire controls could be retrofitted to the Model 700.

● Remington's admission that the fire control alternatives under consideration in the NBAR program and those it claims were geared solely to the Model 700 "attempt to execute the same *idea* (simultaneous blocking of the sear and trigger)" (footnote omitted).

● Remington's concession that the fire-control system research adopted the name "NBAR" in "late 1980 or 1981," about the time of the substantial increase in research funds for the Model 700 fire-control system.

● Remington's admission that "NBAR components which are or have been under consideration include a ... different fire control."

● Statements by Remington that NBAR information has relevance to the relative safety of its models compared to its competitors and the possible need for warnings.

34.    Then, on May 7, 1994, a Texas jury rendered a verdict after Glenn Collins lost his foot to a Model 700 accidental discharge (Fire on Safety Release allegation).  Not only did the jury find that the fire control was defective, it also awarded $15,000,000 in exemplary damages.  The total verdict, which was in excess of $17 million, sent a clear message to Remington—past and *certainly* future use of the defective fire control is unacceptable.

35.    It is difficult to ascertain exactly how many times Remington has embarked on designing a new Model 700 fire control.  It clearly tried with the "NBAR" program, and it clearly tried on several occasions in the 1990's, and it clearly again tried beginning in approximately the year 2000.  By 1995, Remington openly acknowledged the need to "fix" the fire control.  As its documents show, it decided to "[e]liminate 'Fire on Safety Release' malfunction."

36.    Before work continued on a new fire control, Remington's Fire Control Business Contract (January 27, 1995) outlined the project and foreshadowed its end:

> The goal is to provide a fire control that "feels" the same to our customers yet provides additional safeguards against **inadvertent or negligent discharges**.
>
> .  .  .
>
> The purpose of the redesign of the fire control is to reduce the number of parts required, lower cost and to add design characteristics that **enhance the safety attributes** of our firearms.

37.    The next paragraph, however, laments that safety "is not considered a highly marketable feature."  The next full paragraph in the document speaks for itself.  Under "Financial Analysis," appears this telling quote:

> This is where the rubber meets the road.  Is this project worth doing?  What are the minimum forecasts to insure profitability and does our pricing structure support these expected profits?

38.    The project to "enhance the safety attributes of our firearms" is only "worth doing" if Remington can "insure profitability."  True to form, the M700 Improvements Program was cancelled on August 28, 1998.

39.    Remington has repeatedly made a clear economic choice against recalling the Model 700.  But the Model 710 (now the Model 770) was to be a new rifle.  In 1997, and against this sordid and costly fifty-year historical backdrop, Remington faced an important but easily

answered question regarding the new low cost bolt-action rifle it intended for beginner users: What fire control should Remington use?

40.     When embarking on the design of the Model 710, Remington originally elected against the use of the Model 700 fire control, which contains the connector.  Instead, Remington embarked on the design of a "connectorless" fire control.

41.     Derek Watkins, a Remington Engineer, designed a connector-less fire control based on the work performed during the cancelled M700 improvements program.  Watkins touted the benefits of his new design within Remington.

42.     Once again, Remington had a new and safe design.  But the design was allegedly too expensive to implement, and project spending was put on hold in May 1998.

43.     Even though Watkins' design was favored within Remington, the engineering department could not get approval for the economics of the project.

44.     In August 1998, Watkins' safe design was abandoned due to an estimated cost increase.  Motivated once again by the prospect of saving money and increasing its profit margin, Remington decided to pull the unsafe Model 700 fire control off the shelf and use it in the new Model 710 to eliminate development cost and time.  This is the <u>same</u> fire control that it had specifically rejected for the new rifle 18 months earlier.

45.     As Remington began its internal testing of the new Model 710 (with the defective and dangerous Model 700 fire control installed), it is important to note that Remington, knowing the history of the design, even warned its Model 710 testers of the possibility of inadvertent discharge.

46.     No such warning is provided to customers that purchase the Model 710.  And the Model 710 *did* fire on bolt closure and on safety release during testing.

47.    Remington Consumer Team Meeting minutes from December 13, 2001 reveal that Remington actually planned for personal injuries of its customers as a result of inadvertent discharge from Model 710 rifles:

- **Safety/Injury Calls and the Model 710 - Ken**
  If a consumer calls with a safety concern, (i.e. FSR, fires when closed, personal injury or property damage, etc), these calls AND firearms go to Dennis or Fred

48.    Predictably, Remington began receiving reports of injury and accidental discharge from a fire control almost identical to the Model 700 fire control.

49.    Remington is defiant in its reluctance to recall or stop using its fire control, a product that it knows is dangerous and that will kill or injure again, through no fault of the unsuspecting user.  The two or more "replacement campaigns" (recalls) contemplated by Remington were seen as too expensive.  Remington has elected to defend its product in court rather than embark on a recall that would likely save lives.

50.    No government agency can force Remington to recall its product, and Remington has made its internal customer service advisors aware of that fact.  It is only through the court system that Remington may be made to answer for its product.

51.    Remington has consistently elected not to recall its dangerous product for financial reasons, even though it is has designed a new product that removes the problematic connector and eliminates the danger.  Even Remington's past President admits that the new design is safer. This is improper, and Remington should recall all of its rifles containing a "Walker"-based fire control.  Until that time, Plaintiffs in this action seek all measure of damages against Remington to compensate them for their injuries and to make an example of Remington's improper conduct.

52.    Plaintiffs bring this action to recover damages from Defendant arising from Plaintiffs' personal injuries caused by this incident.  Plaintiffs' damages include past and future medical

expenses from their injuries, mental and physical pain and suffering, loss of earnings, and other general and special damages in an amount to be determined by the jury at the trial of this action.

53.     The damages sought by Plaintiffs arose out of circumstances as set forth above in additional detail, but which included: Richard Lee Durison having possession of a Remington 700 and stowing it away and otherwise participating in hunting activities and meeting others, such as the Plaintiffs at a hunting camp, all of which is a reasonable use of the product in the circumstances out of which this lawsuit arises

54.     The Remington 700 rifle at issue in this case was manufactured and sold by Defendant Remington Arms, Co.  through a dealer, although it was not merchantable and reasonably suited to the use intended at the time of its manufacture or sale.  Plaintiffs and the public reasonably expected that the Remington Model 700 purchased would not fire unless the trigger was engaged.

55.     The Remington Model 700 bolt-action rifle was in a defective and dangerous condition when it left Remington's possession because Remington had actual or constructive knowledge that the Walker fire control contained in the rifle was dangerous to users, specifically, that the Walker fire control has a propensity to unexpectedly discharge without the trigger being pulled, and Remington failed to warn of the danger.  Further, requiring that the safety be moved to the "fire" position for unloading also creates a defective and dangerous condition.  The risk was known or, at a minimum, reasonably foreseeable by Defendant.

56.     Neither Plaintiffs nor the rifle handler had knowledge of this defective condition and had no reason to suspect the rifle was unreasonably dangerous because of a propensity to fire without a trigger pull prior to the inadvertent discharge out of which this legal action arises.

57.     Defendant was negligent in the design, manufacture and marketing of the Model 700

rifle.  Defendant acted unreasonably in selecting the design of the Model 700 rifle, by specifically including the Walker fire control trigger mechanism, given the probability and seriousness of the risk posed by the design, the usefulness of the rifle in such a condition, and the burden on Defendant to take necessary steps to eliminate the risk.  Defendant knew, or in the exercise of ordinary care should have known, that the Remington Model 700 rifle containing the Walker fire control was defective and unreasonably dangerous to those persons likely to use the product, and other people in the range of danger, for the purpose and in the manner that it was intended to be used, and for foreseeable misuses of the rifle.

58.    Defendant knew, or in the exercise of ordinary care should have known, of the means of equipping the rifle with an adequate fire control system, thereby preventing injury to Plaintiffs.  Defendant had actual knowledge of the means of designing such a safe product, which would not fail in one or more of the methods identified.  Notwithstanding this knowledge, Defendant failed to equip the product in question with an adequate fire control system to prevent the injuries to Plaintiffs.

59.    Defendant had actual or constructive knowledge of the problems with its Model 700 rifle at the time it was sold, in particular the Walker fire control's propensity to unexpectedly discharge without pulling the trigger, such that the danger was known or, at a minimum, was reasonably foreseeable, but failed to notify or warn of the rifle's dangerous condition.

60.     Both before and after Defendant sold the Remington Model 700 rifle at issue, Defendant knew, or in the exercise of ordinary care should have known, of problems with its Model 700 rifle and its other rifles, but failed to notify or warn Plaintiffs or the public.

61.    Specifically, Defendant knew, or in the exercise of ordinary care should have known, of the Remington Model 700 rifle's propensity to unexpectedly discharge without pulling the

trigger, yet Defendant failed to notify or warn the purchaser or the public either before or following the sale of the rifle.  Defendant also knew that requiring the safety to be in the fire position during loading and unloading was unsafe, and it failed to warn about this danger also.

62.    Defendant failed to use reasonable care in the design, and/or had knowledge of a defect in the design, of the Remington Model 700 rifle, and owed a duty to Plaintiffs and the general public to adequately warn of the defect prior to the sale of the product and thereafter. Failure to warn Plaintiffs of the risks associated with the Model 700 rifle constitutes a breach of Defendant's duties to Plaintiffs and the general public to provide adequate warnings, both before and after the sale of the defective product, of the dangerous conditions of the product.

### COUNT I:
### LOUISIANA PRODUCT LIABILITY ACT

63.    Plaintiffs incorporate by reference the factual allegations averred in paragraphs 9 through 62 *supra* as if set forth verbatim here.

64.    Defendant is liable to Plaintiffs for their injuries pursuant to the Louisiana Product Liability Act arising from the unreasonably dangerous Remington Model 700 bolt action rifle as the facts asserted above and those expected to be revealed during the pre-trial discovery of this matter demonstrate.

65.    The Defendant Remington Arms Co., Inc. is the manufacturer of the product at issue; a Remington Model 700 rifle.

66.    The Plaintiffs' injuries and damages arising out of Jim Stanley and Amanda Land, a minor sustaining gun shot wounds, were proximately caused by a characteristic of the Remington 700 rifle; to wit: it has a propensity to fire inadvertently, without a trigger pull when vibrated in a number of foreseeable vibrations to a rifle during its reasonable and ordinary use as the product is intended.

67.     The Remington 700 rifle's requirement that it be place in the "on Fire" position to operate the bolt and it's propensity to fire inadvertently without a trigger pull upon a number of foreseeable vibrations to a rifle during its reasonable and ordinary use as the product is intended:

(1) Make it unreasonably dangerous in construction or composition;

(2)  Make it unreasonably dangerous in design;

(3) Make it unreasonably dangerous due to inadequate warnings; and

(4) Make it unreasonably dangerous because of nonconformity to an express warranty.

68.     The evidentiary doctrine of *Res Ipsa Loquitur* may be utilized to prove causation under the Louisiana Products Liability Act.

### COUNT II
### LOUISIANA CIVIL CODE
### Art. 2315.6. LIABILITY
### DAMAGES CAUSED BY INJURY TO ANOTHER

69.     Plaintiffs incorporate by reference the factual allegations averred in paragraphs 9 through 68 *supra* as if set forth verbatim here.

70.     Denise Stanley asserts her right to recover as an individual from Defendant Remington Arms, Co. pursuant to LSA-C.C. Art. 2315.6.

71.     Denise Stanley is the biological mother and caretaker of Plaintiff Amanda Land.

72.     Denise Stanley is the spouse of Jim Stanley.

73.     Denise Stanley was a percipient witness to the discharge of the Remington 700 at issue in this lawsuit and the wounds suffered as a result thereof by both her daughter Amanda Land and her husband, Jim Stanley.  Denise Stanley witnessed this horrific event from only a few feet away.

74.     As a result of witnessing her daughter being shot with a high powered deer rifle, Denise Stanley suffered serious mental anguish or emotional distress which can reasonably be

expected by a person in Denise Stanley's position. Furthermore, Denise Stanley's mental anguish or emotional distress was severe, debilitating, and foreseeable.

75.     As a result of witnessing her husband being shot with a high powered deer rifle, Denise Stanley suffered serious mental anguish or emotional distress which can reasonably be expected by a person in Denise Stanley's position. Furthermore, Denise Stanley's mental anguish or emotional distress was severe, debilitating, and foreseeable.

### COUNT III
### SPOLIATION OF EVIDENCE
### PUNITIVE DAMAGESS

76.     Plaintiffs incorporate by reference the factual allegations averred in paragraphs 9 through 75 *supra* as if set forth verbatim here.

77.     The Defendant has intentionally impaired Plaintiffs' claims by intentionally destroying Walker fire control systems which Defendant knew had exhibited its defect by firing without a trigger pull during Defendant Remington Arms, Co.'s own testing of new rifles about to be shipped for sale. Walker fire control systems from Defendant Remington's own testing were destroyed  while lawsuits were pending against Remington asserting that the Walker Fire Control trigger assemblies were defective because their design invites them to fire without a trigger pull which thereafter can conceal itself.   While denying such allegations in multiple lawsuits, Defendant Remington was destroying trigger mechanisms at their factory when rifles fired without a trigger pull in its own testing.

78.     Remington has manufactured its connector-based fire controls since the 1940's. In response to a F.R.C.P. 30(b)(6) deposition notice, Remington's corporate representative testified as follows on November 10, 2010:

> Q.     How many times since 2002 have Remington's connector-containing bolt
>         action rifles fired absent a trigger pull during gallery testing?

A.      Possibly between 100 and 200 is a guess.

Q.      And for the 100 to 200 times that the rifles containing the connector discharged absent a trigger pull, is there any documentation other than the event itself with regard to the occurrence?  And by that, I mean is there -- are there any measurements taken, are there any photographs taken, is there any video taken, anything to document the --

A.      No.

Q.      -- actual state of the fire control?

A.      I am unaware of any documents.

79.     Based on a general statistical calculation, if Remington experienced up to 200 firings of new guns absent a trigger pull since 2002 as testified by Remington's representative, the number of connector-based fire controls destroyed by Defendant Remington may easily exceed 1,000.

80.     Based on knowledge of lawsuits filed against Remington as can be verified by pleadings in other courts, Defendant Remington failed to preserve evidence in it's possession (connector-based trigger mechanisms in new guns that fired without a trigger pull) while on notice that lawsuits were pending in which Defendant Remington denied that the design of it's connector based trigger assembly could cause a rifle to fire without a trigger pull.  Such evidence of the design defect would have provided evidence unfavorable to Remington's Defense.

81.     Defendant's destruction of direct evidence of trigger mechanisms that fired without a trigger pull while in the custody and control of Defendant Remington during the pendency of lawsuits wherein Defendant denied such an occurrence was possible represents bad faith or bad conduct as required under Louisiana law.

82.     Plaintiffs assert a claim for punitive damages for the bad faith acts and omissions by Defendant Remington to destroy evidence as may be deemed proper after further development of this matter and choice of laws analysis for such behavior including the state where the Rifle 700

was manufactured (Ilion, NY), where the trigger mechanisms were destroyed (to be developed during discovery) or where the decision to destroy the trigger mechanisms was made (to be developed during discovery).

## DAMAGES AND JURY DEMAND

83.    Plaintiffs incorporate by reference the factual allegations averred in paragraphs 9 through 82 *supra* as if set forth verbatim here.

84.    As a result of Defendant' acts and/or omissions, Plaintiffs have experienced lost income, diminished earning capacity, medical expenses, past and future, physical pain and suffering in the past and in all reasonable probability will sustain physical pain and suffering in the future.

85.    Plaintiffs have suffered mental anguish in the past and in all reasonable probability will sustain mental anguish in the future.

86.    The above and foregoing acts and/or omissions of Defendant have caused actual damages to Plaintiffs in an amount in excess of the minimum jurisdictional limits of this Court.

87.    Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs Jim Stanley and Denise Stanley, Individually and As Natural Tutrix of her daughter, Amanda Land, a minor prays judgment against Defendant as follows:

1.    For all monetary damages allowed under law and described, without limitation, above, plus interest from the date of judicial demand until paid;

2.    For costs of suit; and

3.    For such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

**MITCHELL J. HOFFMAN (La 6896)**
**(Lead Attorney)**
**MELVIN D. ALBRITTON (LA. 27936)**
**LOWE, STEIN, HOFFMAN, ALLWEISS &**
**HAUVER, LLP.**
701 Poydras St Ste 3600
New Orleans, LA. 70139-7735
Telephone: 504.581.2450
Facsimile: 504.581.2461
Email:  mhoffman@LSHAH.com
            malbritton@LSHAH.com


*/s/ Stephen W. Drinnon*
**STEPHEN W. DRINNON**
Texas State Bar No. 00783983
**THE DRINNON LAW FIRM, PLLC**
1700 Pacific Avenue
Suite 2230
Dallas, Texas 75201
Telephone: 972.445.6080
Facsimile: 972.445.6089
Email:  stephen@drinnonlaw.com
*Admitted Pro hac vice.*


**JEFFREY W. HIGHTOWER, JR.**
Texas State Bar No.  00793951
**HIGHTOWER LAW FIRM**
9400 North Central Expressway
Suite 1207
Dallas, Texas  75231
Telephone:  214.580.9800
Facsimile:  214.580.9804
E-mail:  jeff@hightowerlawoffice.com
*Pro hac* application to be filed
**COUNSEL FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February __, 2011, a copy of the foregoing, "Plaintiffs' First Amended Complaint" was served on the following counsel of record in accordance with the Federal Rules of Civil Procedure:

| <u>Via CM/ECF</u> | <u>Via CM/ECF</u> |
|---|---|
| Thomas R. Juneau, Sr., | Andrew A. Lothson, Esq. |
| Joshua K. Trahan, | Dale G. Wills, Esq. |
| Juneau David, APLC | Swanson, Martin & Bell,LLP |
| 1018 Harding Street, Suite 202 | 330 North Wabash |
| Lafayette, LA 70503 | Chicago, Illinois 60611 |

/s/ Stephen W. Drinnon
STEPHEN DRINNON